WALKER v WOLVERINE FABRICATING & MFG CO, INC

Docket No. 75335. Argued November 13, 1985 (Calendar No. 11).
    Decided August 5, 1986.
    William Walker filed a complaint with the Department of Civil
        Rights against Wolverine Fabricating & Mfg. Co., Inc., alleging
        discrimination because of age in failing to recall him from
        layoff. The Civil Rights Commission, after investigation, dis-
        missed the complaint, finding insufficient grounds on which to
        issue a charge. On reconsideration, the complaint was again
        dismissed, and a second request for reconsideration was denied.
        During this time, the statute of limitations on the plaintiff's
        separate cause of action under the Civil Rights Act expired.
        The Wayne Circuit Court, William J. Giovan, J., prior to
        decision, notified plaintiff's and defendant's counsel that the
        proper appellee in the circuit court was the Civil Rights Com-
        mission and that the issue on appeal would be whether the
        commission's refusal to issue a charge was clearly erroneous.
        After the plaintiff failed to add the commission as a party
        within the time allotted, the appeal was dismissed. The Court
        of Appeals, M. J. KELLY, P.J., and BRONSON and SIMON, JJ.,
        reversed and remanded the case, holding that the plaintiff was
        entitled to a new trial before the circuit court and that Wolve-
        rine was the proper defendant (Docket No. 74805). The Court of
        Appeals also certified a conflict with Burrell v Annapolis Hospi-
        tal, 36 Mich App 537 (1971). The defendant appeals.
            In an opinion by Chief Justice WILLIAMS, joined by Justices
        BRICKLEY, BOYLE, and RILEY, the Supreme Court held:
            A person who is aggrieved by a final decision of the Civil
        Rights Commission and who seeks review in the circuit court is
        not entitled to an entirely new evidentiary proceeding in the
        circuit court. Rather, the circuit court must review the record

REFERENCES

Am Jur 2d, Federal Practice and Procedure §§ 1114-1119.
Sufficiency in federal court of motion in limine to preserve for
    appeal objection to evidence absent contemporary objection at
    trial. 76 ALR Fed 619.
Correction, modification, or supplementation of record on appeal
    under Rule 10(e) of Federal Rules of Appellate Procedure. 60 ALR
    Fed 183.

made before the commission, draw its own inferences and conclusions, and determine whether the commission's findings of fact and legal conclusions were supported by competent, material, and substantial evidence on the whole record, and whether it acted arbitrarily or without authority. The proper appellee in an appeal by an original complainant of a final decision of the commission is the respondent named in the action before the commission, and not the commission itself.

1. The intent underlying the provision of Const 1963, art 5, § 29 that appeals from final orders of the Civil Rights Commission are to be tried de novo before the circuit court having jurisdiction is best effected by requiring circuit courts to review final decisions of the commission de novo by taking a fresh look at the evidence and testimony in the record produced before the agency, and by determining whether the commission's factual findings and legal conclusions are supported by competent, material, and substantial evidence.

2. The phrase "appeals . . . shall be tried de novo" in art 5, § 29 is ambiguous with respect to whether it means a new trial on the record on appeal or a new trial based on the production of new evidence on appeal. The phrase does not lend itself to a common understanding of its meaning either by the people or by legal experts. Reference to judicial construction of the Fair Employment Practices Act on which the provision is based, and to the Civil Rights Act which is based on the provision, however, clearly indicates that the phrase should be interpreted to mean an appeal on the record and not an entirely new evidentiary trial. Such an interpretation is also consistent with the intention of the framers, as evidenced by discussions during the Constitutional Convention.

3. In this case, the circuit court mistakenly believed that it should review the decision of the commission for clear error and that the commission was the proper appellee. Instead, it should have reviewed the investigative record produced before the commission to determine whether the agency had probable cause to find that the defendant had discriminated against the plaintiff because of age. Had it found that probable cause existed, it should have remanded the case to the commission for further proceedings.

Affirmed in part, reversed in part, and remanded.

Justice LEVIN, joined by Justice CAVANAGH, dissenting, stated: The constitution provides that appeals from final orders of the Civil Rights Commission, including refusals to issue complaints, are to be tried de novo before the circuit court. The address to the people explains that de novo means tried anew,

i.e., a complainant is to be given a new trial on appeal. The argument that such a construction would undermine the importance of the commission was for the delegates to the Constitutional Convention to decide, not for the Court.

Two different standards of review of commission orders are articulated by the Court. On the one hand, it states that the circuit court shall undertake de novo review on the record, drawing its own inferences and conclusions and, on the other, that the circuit court shall determine whether the commission's findings and conclusions are supported by competent, material, and substantial evidence on the whole record. Read together, it appears that limited judicial review, not de novo review, is provided, in effect eliminating a new trial on appeal.

In this case, however, there is no evidence, testimony, or record produced by the commission to review. The complaint was dismissed for want of probable cause, and the only "record" was an investigator's file, the contents of which depend upon the thoroughness of the investigation and the industry of the investigator. Unless expanded, such a file ordinarily would not afford the circuit court sufficient basis to evaluate the quality or extent of the investigation or whether the determination of no probable cause was erroneous.

Justice ARCHER took no part in the decision of this case.

138 Mich App 660; 360 NW2d 264 (1984) affirmed in part and reversed in part.

OPINION OF THE COURT

1. CIVIL RIGHTS — CIVIL RIGHTS COMMISSION — APPEALS OF FINAL DECISIONS — TRIAL DE NOVO.

A person who is aggrieved by a final decision of the Civil Rights Commission and who seeks review in the circuit court is not entitled to an entirely new evidentiary proceeding in the circuit court; rather, the circuit court must review the record made before the commission, draw its own inferences and conclusions, and determine whether the commission's findings of fact and legal conclusions were supported by competent, material, and substantial evidence on the whole record, and whether it acted arbitrarily or without authority (Const 1963, art 5, § 29).

2. CIVIL RIGHTS — CIVIL RIGHTS COMMISSION — APPEALS OF FINAL DECISIONS — PARTIES.

The proper appellee in an appeal by an original complainant of a final decision of the Civil Rights Commission is the respondent named in the action before the commission, and not the commission itself.

DISSENTING OPINION BY LEVIN, J.

3. CIVIL RIGHTS — CIVIL RIGHTS COMMISSION — APPEALS OF FINAL
    DECISIONS — TRIAL DE NOVO.
    *Appeals of final decisions of the Civil Rights Commission, includ-
    ing refusals to issue complaints, are to be tried de novo before
    the circuit court; de novo means tried anew, i.e., a complainant
    is to be given a new trial on appeal (Const 1963, art 5, § 29).*

*Law Offices of Philip Green* (by *Philip Green*) for
the plaintiff.

*Dahlberg, Mallender & Gawne* (by *David M.
Gaskin*) for the defendant.

Amicus Curiae:

*Frank J. Kelley,* Attorney General, *Louis J.
Caruso,* Solicitor General, and *Felix E. League,
Martin J. Vittands,* and *Michael J. Moquin,* Assis-
tant Attorneys General, for the Attorney General.

WILLIAMS, C.J. The issue in this case is whether
the provision in Const 1963, art 5, § 29, that ap-
peals from final decisions of the Civil Rights Com-
mission shall be "tried de novo" requires the re-
viewing circuit court to conduct an entirely new
evidentiary hearing or whether it may conduct a
hearing on the record below. This inquiry necessi-
tates a review of 1) the common understanding of
the phrase "appeals . . . tried de novo," 2) the
language and construction of the Fair Employ-
ment Practices Act, which was the model for the
constitutional provision, 3) the background and
purpose of the provision, as demonstrated in the
Constitutional Convention debates, and 4) the lan-
guage and construction of the Civil Rights Act,
which demonstrates present legislative intent re-
garding the scope of judicial review of decisions of
the Civil Rights Commission.

Our review discloses that 1) there is no common understanding of the kind of review given in an appeal to be tried de novo; 2) the overall purpose of the delegates was to establish a Civil Rights Commission beyond legislative ability to disestablish it, and to provide the same kind of review as existed in the FEPA; 3) while three individual delegates spoke in favor of full-scale review with new evidence, a fourth admitted confusion about the meaning of "appeals . . . tried de novo;" and 4) both contemporary judicial interpretation of the phrase "appeals . . . tried de novo" in the FEPA and subsequent legislative interpretation in the Civil Rights Act support the narrower on the record meaning for that phrase.

While the background and language of this constitutional provision do not lend clear guidance to the interpretation to be given the phrase "appeals . . . tried de novo," we hold that the underlying intent of the framers would best be effected by requiring circuit courts to review final decisions of the CRC de novo by taking a fresh look at the evidence and testimony in the record produced before the agency, and by determining whether the CRC's factual findings and legal conclusions are supported by competent, material, and substantial evidence.[1] We also hold that the proper party to defend against a claim that the CRC wrongly refused to issue a charge is the respondent before the CRC, and not the CRC itself.

---

[1] Throughout this opinion, we treat the formulation for appellate review of Fair Employment Practice Commission decisions, which is a review of the findings of fact and decisions of law for "legal error or arbitrary action," *Lesniak v FEPC*, 364 Mich 495, 506; 111 NW2d 790 (1961), and the formulation for the constitutionally required minimum review of agency actions, which is "whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record," Const 1963, art 6, § 28, as requiring the same treatment.

### I. FACTS

On April 23, 1980, William Walker filed a charge of discrimination with the Department of Civil Rights against Wolverine Fabricating & Mfg. Co., Inc. Walker alleged that Wolverine had discriminated against him by failing to recall him from layoff because of his age. The Civil Rights Commission investigated the charge, and, on October 17, 1980, issued a summary of findings and order of dismissal, finding insufficient grounds on which to issue a charge.[2] The CRC reopened the complaint after Walker requested reconsideration of this dismissal. However, on July 16, 1981, the CRC again dismissed the complaint, finding that its prior dismissal was appropriate. Walker's second request for reconsideration was denied on March 21, 1983. At some time prior to this denial, the

[2] The CRC's "Summary of Findings" was as follows:

The claimant, a 45 year old man, alleged he was unfairly denied recall from layoff by the respondent because of his age.

The respondent stated the claimant was not laid off but was terminated because of the relocation of his job to another state.

The claimant was hired by the respondent on April 1, 1963 and worked as a plant engineer until February 28, 1980 [sic, 1979] when he was terminated. On April 20, 1980 the claimant, after inquiring about rehire, learned that a younger man had been hired as a process engineer on February 18, 1980.

A review of the respondent's personnel and employment records shows that the position of process engineer is distinctly different than the position previously held by the claimant and which had been transferred to Blacksbur [sic], Virginia. The new hire was more qualified as a process engineer.

Witnesses, including those named by the claimant, did not support the claimant's allegations.

The respondent employs a total of 89 persons, 56 of whom are over 40.

The claimant was not rehired in accordance with the respondent's standard policy and practice, which is to hire the best qualified applicant.

The investigation did not disclose evidence of unlawful discrimination against the claimant.

statute of limitations on Walker's separate action under the Civil Rights Act expired.

Walker appealed the final decision of the CRC to the Wayne Circuit Court on April 6, 1983. On September 8, 1983, Walker wrote to the court alerting it to constitutional language requiring appeals from final orders of the CRC to be "tried de novo." The following week, Wolverine contested Walker's statements by advising the court that it was limited to determining whether the CRC's refusal to issue a complaint was authorized by law. Wolverine also argued that the appropriate appellee was the CRC itself. On September 23, 1983, the court wrote both counsel stating that the issue on appeal would be whether the CRC's action was "clearly erroneous," and that the CRC was the proper appellee. The court allowed Walker twenty days to make the CRC a party to the appeal.

On October 20, 1983, after the time for serving the CRC had expired, Walker informed the court that he did not intend to add the CRC as a party or to brief the question whether the CRC's dismissal of his complaint was clearly erroneous. Walker contended that he was entitled to a new trial of "all matters reasonably growing out of the investigation of [the administrative] complaint at the Commission level."

On October 21, 1983, the court dismissed Walker's appeal. On appeal, the Court of Appeals reversed and remanded, holding that Walker was entitled to a new trial of his underlying discrimination claim before the circuit court, and that the proper party defendant in the suit was Wolverine, the respondent named in the administrative complaint. *Walker v Wolverine Fabricating & Mfg Co, Inc,* 138 Mich App 660, 667; 360 NW2d 264 (1984). The Court of Appeals also certified a conflict between its decision in *Walker* and that in *Burrell v*

*Annapolis Hospital,* 36 Mich App 537; 193 NW2d
900 (1971), under Administrative Order No. 1984-2.
On April 5, 1985, we granted leave to appeal. 422
Mich 858.

## II. CONSTITUTIONAL LANGUAGE

Const 1963, art 5, § 29 provides:

> There is hereby established a civil rights com-
> mission which shall consist of eight persons, not
> more than four of whom shall be members of the
> same political party, who shall be appointed by the
> governor, by and with the advice and consent of
> the senate, for four-year terms not more than two
> of which shall expire in the same year. It shall be
> the duty of the commission in a manner which
> may be prescribed by law to investigate alleged
> discrimination against any person because of reli-
> gion, race, color or national origin in the enjoy-
> ment of the civil rights guaranteed by law and by
> this constitution, and to secure the equal protec-
> tion of such civil rights without such discrimina-
> tion. The legislature shall provide an annual ap-
> propriation for the effective operation of the com-
> mission.
>
> The commission shall have power, in accordance
> with the provisions of this constitution and of
> general laws governing administrative agencies, to
> promulgate rules and regulations for its own pro-
> cedures, to hold hearings, administer oaths,
> through court authorization to require the attend-
> ance of witnesses and the submission of records, to
> take testimony, and to issue appropriate orders.
> The commission shall have other powers provided
> by law to carry out its purposes. Nothing con-
> tained in this section shall be construed to dimin-
> ish the right of any party to direct and immediate
> legal or equitable remedies in the courts of this
> state.
>
> *Appeals from final orders of the commission,
> including cease and desist orders and refusals to*

*issue complaints, shall be tried de novo before the
circuit court having jurisdiction provided by law.*
[Emphasis added.]

The constitution also includes elsewhere a provi-
sion regarding the kind of review to be given to
final decisions of most administrative agencies,
including those created in the constitution:

> *All final decisions,* findings, rulings and orders *of
> any administrative officer or agency existing under
> the constitution or by law,* which are judicial or
> quasi-judicial and affect private rights or licenses,
> *shall be subject to direct review by the courts as
> provided by law. This review shall include, as a
> minimum, the determination whether such final
> decisions, findings, rulings and orders are author-
> ized by law; and, in cases in which a hearing is
> required, whether the same are supported by com-
> petent, material and substantial evidence on the
> whole record.* Findings of fact in workmen's com-
> pensation proceedings shall be conclusive in the
> absence of fraud unless otherwise provided by law.
> [Const 1963, art 6, § 28. Emphasis added.]

While the specific language of art 5, § 29, controls
the general language of art 6, § 28, *Advisory Opin-
ion on Constitutionality of 1978 PA 426,* 403 Mich
631, 639; 272 NW2d 495 (1978), other canons of
constitutional construction must be examined and
applied in order to determine the meaning of
"appeals . . . shall be tried de novo."

### III. OVERVIEW OF ANALYSIS

Our brief overview as well as our more detailed
analysis can be epitomized as follows. First, there
is no discernible common understanding of "ap-
peals . . . tried de novo," because the phrase is not
a part of the common vocabulary, because the

legal community is of two minds as to what the phrase means, and because the Constitutional Convention's Address to the People merely paraphrases "tried de novo" without defining whether the convention had chosen an on the record or a new evidence meaning. Second, the overall purpose of the convention with respect to the Civil Rights Commission was to establish it beyond legislative ability to disestablish it and to provide the same kind of review as existed for the Fair Employment Practices Commission. Third, there were three delegates who spoke for full-scale review by new evidence, but a fourth confessed confusion as to the meaning of "appeals . . . tried de novo." Fourth, reference to contemporary judicial interpretation of the phrase "tried de novo" in the FEPA as well as to subsequent legislative interpretation in the Civil Rights Act shows that both adopted the narrower, on the record meaning for that phrase.

Weighing the above findings, we reach the conclusion that the phrase "appeals . . . shall be tried de novo" is ambiguous as to whether it means a new trial appeal on the record or a new trial appeal based on the production of new evidence, that reference to the Constitutional Convention also produces an ambiguous rule, but that reference to the contemporary judicial construction of the FEPA on which the constitutional provision is based and to the subsequent Civil Rights Act based on the constitutional provision produces a clear interpretation that "appeals . . . tried de novo" means an appeal on the record. This interpretation furthermore meets the concerns of Constitutional Convention delegates who wanted to protect the public from an arbitrary and nonresponsible commission without making the commission an ineffective and toothless agency whose actions

would be a perfunctory and largely useless prelude to the real action in the circuit court. Our analysis convinces us that trial of appeals on the record is what those who voted for a new civil rights commission really voted for, because anything else would not achieve their purposes.

### IV. RULE OF COMMON UNDERSTANDING

The paramount rule of constitutional construction is that the constitution should be given that interpretation which the great mass of people would have understood when they ratified it. Justice COOLEY described this rule in terms which have been cited many times since:

> A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. Cooley's Const Lim 81. [*Traverse City School Dist v Attorney General,* 384 Mich 390, 405; 185 NW2d 9 (1971).]

The most obvious way to divine what meaning "the great mass of the people themselves would give" any word or phrase would be the common meaning of the language used. But the phrase we seek to interpret here does not readily lend itself to this formulation. "Appeals . . . tried de novo" is in no way a part of the common vocabulary. Consequently, resort to how the common person would interpret that phrase would at best result in speculation. Therefore, we are compelled to turn to the more technical means of interpretation to assign a meaning to "appeals . . . tried de novo."

There are two technical rules by which the common understanding of the people is attempted to be ascertained. First, one can look to the Consti-

tutional Convention's Address to the People for its explanation of an ambiguous term. Second, one can survey contemporaneous judicial decisions and legal commentaries for evidence of a consensus within the legal community regarding the meaning of a term. *Civil Service Comm v Dep't of Labor,* 424 Mich 571, 608, n 98; 384 NW2d 728 (1986). "The framers of a Constitution are presumed to have a knowledge of existing laws, . . . and to act in reference to that knowledge." *Richardson v Secretary of State,* 381 Mich 304, 312; 160 NW2d 883 (1968).

When the Constitutional Convention of 1961-62 released its finished product to the people of Michigan, the delegates included an Address to the People entitled, "What the Proposed New State Constitution Means to You." This address sought to explain each provision in terms the common person could understand. The text following art 5, § 29, which created the CRC, stated:

> This is a new section establishing an eight-member bipartisan civil rights commission to be named by the governor, with advice and consent of the senate, for four-year staggered terms. The commission is given powers and duties, as prescribed by law, to investigate instances of alleged discrimination against any person because of religion, race, color or national origin in the enjoyment of the civil rights guaranteed by this constitution and law; and to secure the equal protection of such rights without discrimination.
>
> The legislature is directed to provide an annual appropriation for the effective operation of the commission whose powers are enumerated in the second paragraph.
>
> Nothing contained in the section is to be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of the state. *Appeals from final orders of*

> *the commission shall be tried anew before the*
> *circuit court having jurisdiction.* [2 Official Record,
> Constitutional Convention 1961, pp 3383-3384. Em-
> phasis added.]

The emphasized portion of the address does not
clearly delineate in terms likely to be understood
by the common person the kind of appeal, i.e., on
the record or new evidence, to be taken from final
orders of the CRC. Indeed, it is relevant to note
here that one of the four delegates who spoke
about this provision prior to its adoption stated:

> Mr. President and fellow delegates, this puts the
> nonlawyer in a pretty bad position here. These big
> words "de novo" and all this stuff is kind of
> confusing. I have been trying to find out exactly
> what the lawyers are talking about, but to me this
> seems like a desirable amendment . . . . [*Id.,* 3118
> (Delegate Barthwell).]

Delegate Barthwell's candid admission of confu-
sion suggests that the great mass of people would
not likely have known exactly what kind of "ap-
peal" something "tried de novo" or "tried anew"
from a final order of the Civil Rights Commission
would receive.

Indeed, it appears that even those schooled in
the law attached divergent meanings to this term
of art. Professor Cramton, writing just after the
adoption of the new constitution, exposed the vari-
able interpretations to be given this term:

> A minimum interpretation of the words "de
> novo," consistent with the provisions of the Fair
> Employment Practices Act, would require the re-
> viewing court to exercise its independent judgment
> as to questions of fact, as well as law, on the
> record compiled before the Civil Rights Commis-
> sion . . . . A broader reading would require re-

hearing of the entire case, so that the court might enter its own findings of fact after hearing the witnesses. [Cramton, *The powers of the Michigan Civil Rights Commission,* 63 Mich L R 5, 24 (1964).]

The issue had not been resolved in the professional literature four years later:

A third controversial issue involves the meaning of the appeals provision of Article V, Section 29, which states that appeals "shall be tried *de novo* before the circuit court having jurisdiction provided by law." . . . As defendant in the appeal [in a recent case], the civil rights commission pointed to its rules which, under Michigan's administrative procedure act, spell out procedural safeguards in administrative hearings. The commission contended that a substantial body of weighty opinion, known to con-con delegates when they wrote the appeal provision, construes "trial *de novo*" to be a review on the record only; otherwise, the "[administrative] hearing would be an exercise in futility." [Sturm & Whitaker, Implementing a New Constitution: The Michigan Experience (1968), p 126.]

A treatise from the same period suggests that the directive that appeals from agency decisions be heard "de novo" "create[s] more problems than it solves" because of its imprecision. 2 Cooper, State Administrative Law, p 604, n 5.

Decisions of the courts of this state both prior and subsequent to the adoption of the provision also demonstrate a lack of "common understanding" as to the meaning of an appeal to be tried de novo. Several decisions indicate that such a review must be based on the record produced before the administrative agency. For example, in *Darling Co v Water Resources Comm,* 341 Mich 654; 67 NW2d 890 (1955), this Court decided whether proceedings before the Water Resources Commission afforded a

party procedural due process. The statute providing for review from Water Resource Commission decisions stated that its orders "may be reviewed *de novo* in the circuit court." 1949 PA 117, MCL 323.7, 323.8; MSA 3.527, 3.528. The Darling Company had argued before the circuit court that it should "hear the whole controversy based on evidence submitted to the court anew by the parties." *Darling Co, supra,* 659. We agreed with the circuit court that review de novo did not entail a new evidentiary hearing:

> The legislature provided for an appeal from the decision and order of the commission to the circuit court and that said appeal would be determined in chancery as a trial *de novo.* This provision did not obviate the necessity of a proper, legal hearing before the commission. . . . The legislature gave to the court the right and duty to pass judgment upon the decision and order of the commission based on the record of such proceedings before said commission. [*Id.,* 665.]

Similarly, review "de novo" was presumed to be an examination of the entire record below and weighing of all the evidence presented there as if there had been no prior determination in *Kar v Hogan,* 399 Mich 529, 546, 553; 251 NW2d 77 (1976). *Kar* concerned an attempt to invalidate a deed on the ground that it was procured through undue influence. We stated, "As we hear chancery cases *de novo,* it is our duty to examine the entire record and weigh all the evidence presented." *Id.,* 546, citing *Hawthorne v Dunn,* 210 Mich 176, 179; 177 NW 393 (1920) ("we hear chancery cases *de novo* with a duty of reaching an independent conclusion aided as we must be by the conclusions

of the trial judge but not controlled by them").[3]
See also *Civil Rights Comm v Chrysler Corp,* 80
Mich App 368, 374; 263 NW2d 376 (1977) (proper
for the circuit court to make its decision on the
basis of the record made before the hearing ref-
eree); *Ypsilanti v Civil Rights Comm,* 55 Mich App
103, 113; 221 NW2d 923 (1974) (partial concur-
rence by DANHOF, P.J.; party dissatisfied with
commission decision could take an appeal to the
circuit court on the record developed before the
commission).

However, on the other hand, we found no Su-
preme Court opinion holding that a de novo appeal
gives the right to present new evidence. However,
in passing, two cases suggested that might be the
case. In reviewing an appeal of a CRC case in
presenting the facts, this Court in a per curiam
opinion said: "The matter was heard *de novo* in
that [circuit] court, though no new witnesses or
evidence was introduced." *Dixon v Ford Motor Co,*
402 Mich 315, 316; 262 NW2d 666 (1978).[4] In
dissenting from the majority's holding that a re-
spondent could not remove a suit directly from the
Civil Rights Commission to circuit court, Justice
BRENNAN in argument assumed that any matter
considered by the commission would have to be
"relitigated" in circuit court anyway because of
the constitutional provision for trial de novo. *Civil
Rights Comm v Clark,* 390 Mich 717, 731; 212

---

[3] Cf. the dissenting opinion by Justice LEVIN, arguing that the
"clearly erroneous" standard of review made applicable to all actions
tried without a jury by GCR 1963, 517.1 should apply. *Kar, supra,*
546-554. Notably, however, Justice LEVIN appears to have concluded
that a "trial *de novo*" would not require an entirely new evidentiary
hearing in the appellate court: "*De novo* review is distinguishable
from a trial *de novo,* where the evidence may be considered as if
there had been no prior determination. *De novo* review meant in
practice a review of limited scope without definite guidelines." *Id.,*
553.

[4] Notably, however, the circuit court in *Dixon* presumed that an
appeal tried de novo was based on the record produced below.

NW2d 912 (1973) (BRENNAN, J., dissenting). The
Court of Appeals in *Burrell v Annapolis Hospital,
supra,* 540, stated that the constitution entitles
appellants from adverse decisions of the CRC to a
complete new trial, but that nothing prevents the
parties from agreeing to submit the appeal on the
record made before the commission.

In summary, then, it appears that neither the
people who voted for this constitutional provision
nor the legal "experts" had a "common under-
standing" of the meaning of the phrase "appeals
. . . shall be tried de novo." Because no common
understanding can be derived, we are forced to
examine other rules of constitutional interpreta-
tion.

### V. THE *LESNIAK* DECISION

The survey of contemporaneous legal authority
in the preceding section was an effort to ascertain
whether in general there was a particular inter-
pretation given the phrase "appeals . . . tried de
novo." The answer was indecisive and ambiguous.
But there is an important answer from another
perspective. In the months just preceding the
adoption of the constitutional provision at issue,
this Court had occasion to consider the meaning of
an appeal to be "tried de novo" under the Fair
Employment Practices Act. *Lesniak v FEPC,* 364
Mich 495; 111 NW2d 790 (1961).

Because efforts to discern a common understand-
ing of the phrase, "appeals . . . tried de novo,"
have proven futile, and because the framers of the
CRC amendment expressly modeled CRC appeal
procedures on those found in the FEPA, *Lesniak*
provides an especially reliable guidepost, and thus
deserves special prominence in this analysis. We

believe this inquiry, then, is of particular significance.

Excerpts from the Constitutional Convention debates disclose that the CRC amendment's proponent intended to provide for the same kind of judicial review which was then available from final decisions of the FEPC. Delegate Higgs stated:

> The background of this particular sentence is actually a digest of [MCL 423.308] MSA section 17.458(8), a part of the Michigan state fair employment practices act. . . . I think, in view of the experience that the state has had—which to my understanding has been satisfactory and approved by the people working with this commission—that this practice has been satisfactory and that this, in effect, will give greater significance and meaning to this particular article.
>
> . . . I think it is most significant that we pay as much attention to details as possible, and this is what led me to read and examine the Michigan fair employment practices act. . . .
>
> So that you will all understand just what is meant by the words in this sentence, this actually is a digest of about 3 or 4 times the language that appears in the section cited. [2 Official Record, Constitutional Convention 1961, p 3118.][5]

Because *Lesniak* was decided several months before the amendment was introduced, we can assume that the delegates intended to model appeals from CRC decisions on the kind of appeal available from FEPC decisions, as decided in *Lesniak*.

The Fair Employment Practices Commission was created in the Fair Employment Practices Act. 1955 PA 251, MCL 423.301 *et seq.;* MSA 17.458(1)

---

[5] The FEPC was also mentioned as a model for the new CRC in debates of other sections of Const 1963, art 5, § 29. See, e.g., *id.,* 1997, 2195, 2757.

*et seq.*[6] The language in dispute in the case at bar appears to have been drawn directly from the appeal provisions of the FEPA:

> Any complainant, intervener or respondent claiming to be aggrieved by a final order of the commission, including a refusal to issue a complaint, may appeal to the circuit court of the State of Michigan within any county wherein the unfair employment practice, which is the subject of the commission's order, was committed, or wherein any respondent required in the order to cease and desist from an unfair employment practice, or to take other affirmative action, resides or transacts business and *such appeal shall be tried de novo before said circuit court.* [MCL 423.308; MSA 17.458(8). Emphasis added. Repealed by 1976 PA 453.]

Other subsections of the same statute 1) required the FEPC to file with the court a transcript of the hearing before it, 2) empowered the circuit court to enforce, modify, and set aside in whole or in part the FEPC's order, 3) limited the issues on appeal to those which had been heard by the FEPC, unless there were reasonable grounds for having failed to raise them before the FEPC, and 4) allowed the circuit court to remand the case to the FEPC in order to gather additional evidence. MCL 423.308; MSA 17.458(8). Another section preserved the

[6] The FEPA was enacted in 1955; the act defined a civil right to employment without discrimination and created the FEPC to administer the act. On January 1, 1964, both the new constitution and the new Civil Rights Act took effect. 1963 (2nd Ex Sess) PA 45, MCL 37.1 *et seq.;* MSA 3.548(1) *et seq.* The new Civil Rights Act amended the FEPA by substituting references to the CRC for all references to the FEPC. By 1976 PA 453, effective March 31, 1977, the Legislature repealed the FEPA, the original Civil Rights Act, and the Fair Housing Act, MCL 564.101 *et seq.;* MSA 26.1300(101) *et seq.* The basic substantive provisions of these acts were reenacted at the same time under the new Michigan Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.* See *Civil Rights Comm v Chrysler Corp, supra,* 372, n 1.

right to a jury trial in the proceeding before the circuit court. MCL 423.10; MSA 17.458(10).

In *Lesniak,* as in this case, the agency dismissed a complaint of employment discrimination because its investigation failed to produce sufficient grounds to sustain the complaint. The plaintiff was granted a new evidentiary hearing in the circuit court without regard to the record compiled before the FEPC.

On appeal, we analyzed all the requirements in the statute in order to determine whether the scope of appeal intended was quite narrow or quite broad, requiring a hearing on the record or an entirely new evidentiary hearing. We recognized that the language "appeals shall be tried de novo" could "reveal an intention on the part of the legislature that a wholly new proceeding, with the authorization of new issues, new testimony, and a new record, and entirely new and possibly different findings of fact, were provided for." *Lesniak, supra,* 502. However, we concluded that the remainder of the subsections refuted this intent.

The remaining subsections requiring the filing of transcripts of the record before the FEPC, limiting the remedies which could be granted by the circuit court, limiting the issues to those heard by the FEPC, and providing for remitting the case to the FEPC for further testimony, were "entirely inconsistent with the view of the construction of the words 'shall be tried *de novo* before said circuit court' as sought by plaintiff-appellee." *Id.,* 502-503. We also found these subsections completely at odds with a later provision purporting to guarantee a jury trial in such appeals. *Id.* Faced with these ambiguities, we observed:

To set up such an elaborate machinery to perform a specific administrative and quasi-judicial

function, and then to provide for trial *de novo* and a hearing and finding of fact before a jury in circuit court, builds an irreconcilable contradiction into the framework of the statute.

The *de novo* trial provisions and the jury trial provisions of the appeal sections are in direct conflict with both the balance of the appeal sections of the statute and the purpose, structure and form of the main portions of the statute itself. [*Id.,* 504.]

We ultimately construed the statute as requiring an appeal "in the nature of certiorari where the circuit court would review for legal error or arbitrary action the findings of fact and decisions of the fair employment practices commission." *Id.,* 505-506. The fact that this decision was reached in part to avoid an interpretation which would unconstitutionally delegate factfinding functions of an agency to the courts does not detract from the remainder of this Court's analysis.

We recognize that the inclusion of the "tried de novo" language in art 5, § 29, eliminates any question of the constitutionality of the appeal procedure from decisions of the CRC. Yet we find very persuasive the analysis in *Lesniak* that an appeal to be tried de novo does not require an entirely new evidentiary trial.

### VI. THE CONSTITUTIONAL CONVENTION DEBATES

Again, because our efforts to divine the common understanding of this constitutional provision did not meet with success, we must turn to other means of interpretation. In this section, we examine the debates of the Constitutional Convention in order to understand the events leading to the adoption of the provision and the purposes sought to be accomplished. In so doing, we must bear in mind the following admonition:

The debates must be placed in perspective. They are individual expressions of concepts as the speakers perceive them (or make an effort to explain them). Although they are sometimes illuminating, affording a sense of direction, they are not decisive as to the intent of the general convention (or of the people) in adopting the measures. [*Univ of Michigan Regents v Michigan,* 395 Mich 52, 59-60; 235 NW2d 1 (1975).]

The Constitutional Convention debates surrounding the creation of the Civil Rights Commission reveal that the primary reason for its inclusion in the constitution was the Legislature's past unwillingness to act on bills which would create it legislatively. 2 Official Record, Constitutional Convention 1961, p 2004 (Delegate Hodges). The importance of the commission's work in improving employment and race relations made it imperative that the Legislature not be given the freedom to sabotage the work of the commission. On the other hand, some delegates were very concerned that the commission not become an unchecked fourth branch of government. Hence, throughout the convention, delegates from both camps worked to create an agency with enough power to survive legislative attempts to eviscerate it, and with enough limitations to preclude its acting arbitrarily.

The delegates assumed that in most respects, the CRC would resemble other administrative agencies. They also initially contemplated that the CRC would be subject to the same scope of judicial review as that provided for other agencies in Const 1963, art 6, § 28, or "Committee Proposal 95" as it was then known. Early in the debate Delegate Martin, who chaired the committee which advanced the CRC proposal, stated:

What I'm trying to accomplish [with an amend-

ment to give the agency power to promulgate rules, etc., *pursuant to law*] is to find some phrase or wording which will make the activities of this administrative agency subject to the same limitations as other administrative agencies. [2 Official Record, Constitutional Convention 1961, p 1994.]

I say, Mr. Garvin, we did not feel that [the diminish-the-right clause] was harmful, and therefore, we felt that there was no necessity for removing it. *The general provisions of Committee Proposal 95, of course, would seem to apply to this as well as to any other administrative tribunal.* However, this is just off the cuff. I'm just looking at it here. I see no reason why 95 doesn't apply to this as well as to other administrative tribunals. [*Id.,* 2757. Emphasis added.]

Delegate Garvin stated:

[The diminish-the-right clause] destroys the commission . . . . And, in addition to that, it is noted in line 13 that already, before [the diminish-the-right clause] was put in, it is stated how *they should proceed according to general laws governing administrative agencies. And Committee Proposal 95* of the judicial article *definitely states how administrative agencies should operate.* [*Id.,* 2192. Emphasis added.]

There is no need to give any special treatment to this commission that is not given to others because I do not believe it is a special commission. It is another commission, the civil rights commission. Now, the language that is to be stricken, "Nothing contained in this section shall be construed . . ." as you can see on the board—all it does is add something to a provision that we already have in Committee Proposal 95. [*Id.,* 2757.]

Delegate Norris stated:

I ought to say, too, that by your passage the other day of Committee Proposal 95, where you

state that every order or rule of the commission has to be supported by competent, material and substantial evidence, there is indeed a very adequate protection for the respondent here. [*Id.,* 2756.]

It is the whole theory of the self executory concept of this commission that it take jurisdiction, proceed to investigate complaint [sic] and go through the procedures of making the finding, seeking to conciliate and moderate and enter an order. And this order would be supported by competent, material and substantial evidence. And then the party if aggrieved, could then have an appeal after the administrative remedies have been exhausted. This is the theory of all administrative tribunals. [*Id.,* 2761.]

Thus, these delegates thought that courts would review final decisions of the CRC to see whether they were authorized by law and supported by competent, material, and substantial evidence on the whole record.

On the third reading of the article creating the CRC, Delegate Higgs offered the amendments on which our inquiry is centered. His proposal became the third paragraph of Const 1963, art 5, § 29. The entire debate of that provision takes up roughly one-half page of the record, and is reproduced in its entirety:

SECRETARY CHASE: Mr. Higgs offers the following amendment:

1. Amend article V, section 28 [sic] (second column, following line 57) by adding a new paragraph to read as follows:

"Appeals from final orders of the commission, including cease and desist orders and refusals to issue complaints, shall be tried de novo before the circuit court of the state having jurisdiction provided by law."

VICE PRESIDENT HUTCHINSON: Mr. Higgs.

Mr. Higgs: Mr. President and fellow delegates, this particular sentence is proposed to be added to the civil rights commission article but in no way is to be substituted for or to change the wording of the provision as it is now approved by this convention.

The background of this particular sentence is actually a digest of [MCL 423.308] MSA section 17.458(8), a part of the Michigan state fair employment practices act. What is involved here is to provide an orderly method or an orderly procedure for appealing from orders of the commission. I think, in view of the experience that the state has had—which to my understanding has been satisfactory and approved by the people working with this commission—that this practice has been satisfactory and that this, in effect, will give greater significance and meaning to this particular article.

Now, of course, in view of the fact that we are actually writing into the constitution a commission, I think it is most significant that we pay as much attention to details as possible, and this is what led me to read and examine the Michigan fair employment practices act. This involves about 8 pages of statutory detail. I think that, actually, the commission that we have provided for in the constitution is as fairly complete as possible in constitutional language. There is a great deal that must be involved by way of implementation by the legislature. I would like, however, to give further direction and significance to this particular method of procedure, inasmuch as I think we have not provided or shown the way.

So that you will all understand just what is meant by the words in this sentence, this actually is a digest of about 3 or 4 times the language that appears in the section cited. The words "de novo," of course, mean a new trial. It means that a person who is really aggrieved has the opportunity to re-present his evidence before a court of law. However, this appeal procedure involves an appeal from the final order of the commission.

I think that, actually, according to my informa-

tion, there are many matters that come before these commissions that do not involve a great deal by way of money. They do not involve a great deal by way of case or controversy in the ordinary sense, and probably the bulk of matters that will come before this commission will be handled by the commission satisfactorily to all parties. Now, in those instances where a party feels aggrieved, I think that his opportunity should be in the courts of the state.

It was my understanding that—before I offered this amendment I had made an effort to communicate as broadly as possible with interested persons in this convention and it seemed to me that there is substantial support here for this procedure, for these words, for this provision. I would like to yield the floor to those interested persons who would like to speak upon it.

VICE PRESIDENT HUTCHINSON: Mr. Garvin.

MR. GARVIN: Mr. President and delegates, of course you know I have been interested in this particular section, section 28. I was somewhat concerned and still am about the last sentence in that section. However, it seems that over the 2 readings—and this is the third reading—the delegation is determined to keep it in.

In line with that, I believe that the amendment of Delegate Higgs is rather in line with the general intent to give the person aggrieved, whether he be plaintiff or defendant, the right to have a new trial before a court. "De novo" means "anew," which means that they shall try the case from the beginning, before the circuit court. I can have no objection to that addition to this particular section and I will not oppose it.

VICE PRESIDENT HUTCHINSON: The question is upon the amendment. Mr. Martin.

MR. MARTIN: Mr. President, Mr. Higgs' amendment has had a good deal of discussion. Mr. Garvin and a good many others have looked at it. It seems to be a reasonable addition and it does provide the same provisions, precisely, as the fair employment practices act on this matter. It re-

quires a trial de novo on any matter that is appealed to the courts. I think it is probably a desirable amendment and I think the committee would favor it.

VICE PRESIDENT HUTCHINSON: The question is upon the amendment. Mr. Barthwell.

MR. BARTHWELL: Mr. President and fellow delegates, this puts the nonlawyer in a pretty bad position here. These big words "de novo" and all this stuff is kind of confusing. I have been trying to find out exactly what the lawyers are talking about, but to me this seems like a desirable amendment so I want to urge the delegates to vote yes for the amendment, please. [2 Official Record, Constitutional Convention 1961, p 3118.]

The first three delegates who spoke to the meaning of the phrase "tried de novo" all indicated that an entirely new opportunity to present evidence would be provided before the "reviewing" court without regard to the record produced in or the action taken by the commission. However, several other factors lead us to question whether this was the understanding of the majority of the delegates. First, as pointed out already, Delegate Barthwell's confusion about the meaning of this legal term of art may have reflected more widespread confusion. Second, this amendment was adopted without any discussion of the effect it would have on the applicability of Const 1963, art 6, § 28 to the final decisions of the CRC. This is particularly unsettling because of the apparent understanding of the delegates, demonstrated above, that Const 1963, art 6, § 28 provided the necessary check on the CRC's decisionmaking power. Third, allowing anyone who feels aggrieved by a decision of the CRC to retry the underlying discrimination claim from the start in circuit court as an "appeal" undeniably undermines the importance of the CRC, and significantly decreases any incentive to utilize the CRC's

conciliation services. In light of the rhetoric surrounding the creation of the CRC as a self-executing, constitutionally mandated agency, it seems unlikely that the majority of the delegates would have intended this result.

## VII. THE CIVIL RIGHTS ACT

Because we find the Constitutional Convention debates inconclusive, we turn to the Civil Rights Act, which embodies the Legislature's present interpretation of the constitutionally mandated relationship between the CRC and a reviewing court. "[T]he natural meaning of the language used and . . . the contemporaneous and subsequent constructions of the legislatures of the State . . . are entitled to weight in determining the proper construction of the constitutional provisions." *Smith v Auditor General,* 165 Mich 140, 144; 130 NW 557 (1911).

The way in which the Legislature has subsequently provided for appeals from decisions of the CRC is entitled to greater than usual weight for the following reason. Const 1963, art 5, § 29 provides that the commission shall perform enumerated duties "in a manner which may be prescribed by law," that the commission shall have other powers to carry out its purposes which are "provided by law," and that circuit courts exercising appellate review of decisions of the CRC shall act within "jurisdiction provided by law." This language indicates that the delegates assumed that the Legislature would have a legitimate role in defining the commission's powers. This assumption was voiced by several of the delegates at the Constitutional Convention:

This is the barest kind of bones of authority to

operate. It does not specify how, and it would undoubtedly fall to the legislature to implement this with legislation, filling in gaps as to what needed to be done. [2 Official Record, Constitutional Convention 1961, p 1990 (Delegate Martin).]

We have to recognize that we have given the legislature several vetoes already, but we have not made it possible to prevent the commission from coming into being. The legislative checks that now exist . . . first of all contain a pocketbook veto, . . . . Secondly, we provide the legislature may provide for methods of implementing these duties . . . . Thirdly, we now have provided that the legislature may, if they wish, change the powers. [*Id.*, 1998 (Delegate Nord).]

Because the constitution contemplates the Legislature playing a significant role in defining the powers of the CRC, subsequent legislation is entitled to greater weight in this case than in others where the legislative role is more circumscribed.

Existing legislation indicates that the Legislature has interpreted an "appeal . . . tried de novo" as something less than a full new evidentiary hearing. The Civil Rights Act provides:

A complainant and a respondent shall have a right of appeal from a final order of the commission, including cease and desist orders and refusals to issue charges, before the circuit court . . . . *An appeal* before the circuit court *shall be reviewed de novo.*

* * *

Within 30 days after the service of the petition upon the commission . . ., the *commission shall transmit to the court* the original or a certified copy of *the entire record upon which the order is based,* including a transcript of the testimony . . . . By stipulation of the parties to the review proceeding, the record may be shortened. *The court may . . . enter an order enforcing, modifying*

*and enforcing* as modified, *or setting aside* in whole or in part *the order of the commission, or may remand the case to the commission for further proceedings.* [MCL 37.2606; MSA 3.548(606). Emphasis added.]

First, the Legislature has used the term *review de novo,* rather than *"tried de novo."* "Review de novo" more accurately describes the procedures set forth in the succeeding provisions. Those procedures clearly contemplate a review on the record produced before the commission. Otherwise, there would be no need for the mandatory language requiring the commission to certify its record to the circuit court in every appeal. In addition, the circuit court is limited in the kinds of relief it can grant to the appellant: The words "enforce," "modify," and "set aside" indicate that the circuit court acts with reference to the remedy fashioned by the CRC, rather than formulating an entirely new remedy after looking at newly presented evidence and testimony. Further proceedings are not to be undertaken at the circuit court, but rather are to be held before the CRC. Nothing indicates that the Legislature has felt it necessary or desirable to allow a party disappointed by the CRC's decision to have a new evidentiary trial on the merits of the discrimination claim in an *appeal from* the CRC's decision.

Indeed, an opportunity for a completely new evidentiary trial would seem unnecessary in light of the fact that one who claims to be the victim of employment discrimination has a wholly separate cause of action and remedy under the Civil Rights Act. The act provides that "[a] person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both." MCL 37.2801; MSA 3.548(801). This provision has been held to entitle a person to a judicial remedy

which is cumulative to that available through the
CRC's remedial machinery. *Holmes v Haughton
Elevator Co,* 404 Mich 36, 41-42; 272 NW2d 550
(1978); *Strachan v Mutual Aid & Neighborhood
Club, Inc,* 407 Mich 928; 285 NW2d 297 (1979). See
also *Pompey v General Motors,* 385 Mich 537, 551;
189 NW2d 243 (1971) (finding a judicial remedy for
claims of race discrimination cumulative to that
provided for in the FEPA).

It is unlikely that the Legislature intended to
provide for *three* opportunities for a party to have
discrimination claims presented to a tribunal with
new and original evidence, which would be the
case if the constitutional requirement of an appeal
by trial de novo were interpreted to require an
entirely new evidentiary hearing before the circuit
court on appeal. Such a result would truly reduce
the CRC's decision to, at best, an advisory opinion
and, at worst, a pointless consumption of time and
resources for all parties involved. The certainty of
relitigation "on appeal" would also severely under-
mine attempts by the CRC to resolve the dispute
through conciliation. The language "review de
novo" and the policies underlying existing legisla-
tion suggest that an interpretation of "appeals . . .
tried de novo" which affords independent review
on the record would best effect the framers' ex-
pressed desire to create a civil rights commission
with significant power.

### VIII. SUMMARY AND CONCLUSION

The constitutional language providing that an
appeal from a final decision of the CRC shall be
"tried de novo" before a circuit court ambiguously
defines the scope of review by the circuit court. In
the absence of a "common understanding" of the
phrase, "appeals . . . shall be tried de novo," it is

necessary to examine the historical record. In examining the events leading up to the inclusion of the CRC in the constitution, and the purposes sought to be accomplished by this kind of appeal, one can conclude that delegates intended to make available the kind of review that was then available to those aggrieved by decisions of the FEPC, although there were some who had in mind a whole new evidentiary trial. As interpreted by this Court in *Lesniak,* the kind of review then available was review of the findings of fact and conclusions of law for legal error or arbitrary action. The delegates also intended that the Legislature retain a significant role in defining the power of the CRC. Legislation (Civil Rights Act) based on the FEPA, but enacted subsequent to the adoption of the new constitution, confirms the interpretation made in *Lesniak:* A *de novo* appeal *on the record* produced at the CRC, and *not* an entirely new evidentiary hearing, was intended. Any other interpretation would wholly undermine the primary objective of the delegates: to create a commission capable of mediating and deciding discrimination disputes inexpensively and swiftly.

Therefore, we hold that one who is aggrieved by a final decision of the CRC and who seeks review in the circuit court is not entitled to an entirely new evidentiary proceeding in the circuit court. Rather, the circuit court shall review the record produced at the CRC anew, drawing its own inferences and conclusions from that record. The court shall determine whether the CRC's factual findings and legal conclusions are supported by competent, material, and substantial evidence on the whole record, and whether it acted arbitrarily or without authority. In addition, for the reasons stated by the Court of Appeals, we hold that the proper party to defend against an appeal brought by the

original complainant is the respondent named in the action before the CRC, and not the CRC itself. *Walker, supra,* 667-668.

In the case at bar, the circuit court mistakenly believed that it should review the decision of the CRC for clear error and that the CRC was the proper appellee. It should have reviewed the investigative record produced before the CRC for purposes of determining whether the agency had probable cause to find that Wolverine had discriminated against Walker because of his age. Had it found that probable cause existed, it should have remanded the case to the CRC for further proceedings in accordance with other cases where probable cause has been found.

The decision of the Court of Appeals is affirmed in part and reversed in part, and the case is remanded to the circuit court for proceedings consistent with this opinion.

BRICKLEY, BOYLE, and RILEY, JJ., concurred with WILLIAMS, C.J.

LEVIN, J. (*dissenting*). The opinion of the Court "hold[s] that the underlying intent of the framers would best be effected by requiring circuit courts to review final decisions of the CRC *de novo* by taking a fresh look at the *evidence and testimony in the record* produced before the agency, and by determining whether the CRC's factual findings and legal conclusions are supported by competent, material, and substantial evidence." *Ante,* p 590. (Emphasis supplied.)

In the instant case, however, *no evidence, testimony, or record was produced by the agency.* Walker filed a charge of discrimination on April 23, 1980, and was advised on October 17, 1980, that the Civil Rights Commission had found insuf-

ficient grounds to issue a charge and, therefore, his complaint had been dismissed. Accompanying the order of dismissal was a statement of the findings and conclusions of the commission. While these refer to "witnesses including those named by the claimant," there was no hearing at which witnesses testified.

The Department of Civil Rights investigates a charge of discrimination. Witnesses are interviewed in the course of the investigation. The investigator files a report and, on the basis of that report, an administrative decision is made whether to file a complaint with the commission or to dismiss for lack of probable cause. The only "record" is the file compiled by the investigator in the course of the investigation.

The contents of the investigative file will depend on the thoroughness of the investigation and the industry of the investigator. The investigative file may or may not contain a full, complete, and objective record of all the evidence that the complainant supplied. It may or may not contain an accurate report of the evidence that the witnesses who were interviewed would, if called to testify, provide. All the witnesses may not have been interviewed.

A circuit judge, on review of such a "record," would find only what the investigator placed in the file which, again, may not be a complete record of all that could or should be placed in the file.

Unless the investigative file "record" can be expanded, the complainant would not have an opportunity to refute or supplement what the investigator has reflected in the file. Unless the file "record" can be expanded, the circuit judge ordinarily could not evaluate the quality or extent of the investigation. Only if on the face of the materials placed by the CRC in the file it is apparent

either that the investigator made an erroneous determination of no probable cause or that the investigation was so woefully deficient as to amount to no investigation at all would the circuit judge be able to grant relief to a complainant.

I

While the question here is whether the crc erred in failing to find probable cause, what is said by the Court in this case will be read as applying where there has been a crc hearing following a finding of probable cause. The practice until now has been to provide a new trial on appeal following a crc hearing. The opinion of the Court will henceforth deprive both sides—employers and other defendants as well as workers and other complainants—of the opportunity to try the cause anew.

The constitution provides that appeals from final orders of the commission, including refusals to issue complaints, "shall be *tried de novo* before the circuit court . . . ." Const 1963, art 5, § 29. The Address to the People, in explaining what the words *"tried de novo"* mean, stated that "appeals from final orders of the commission shall be *tried anew* before the circuit court having jurisdiction."[1] (Emphasis supplied.) The words "tried anew" should, in my opinion, be given their ordinary every day meaning, namely, a new trial.

The record of the Constitutional Convention supports the view that a new trial, a trial anew, is the intended meaning. The delegate who offered the amendment said: "The words '*de novo,*' of course, mean a new trial. It means that a person who is really aggrieved has the opportunity to *re-present* his evidence before a court of law." (Em-

---

[1] 2 Official Record, Constitutional Convention 1961, pp 3383-3384.

phasis supplied.) Another delegate who spoke said that "the person aggrieved, whether he be plaintiff or defendant, [would have] the right to have a new trial before a court. *'De novo'* means 'anew,' which means that they shall *try the case from the beginning.*"[2] (Emphasis supplied.)

The opinion of the Court dismisses the clear statements of the proponent of the amendment that its adoption would permit the aggrieved party to "re-present his evidence" and of the delegate who said that this would permit the aggrieved person to "try the case from the beginning" because another delegate said that he would vote for the amendment although he didn't fully understand the de novo terminology and still another had adverted to the FEPA, which provided for a *"trial de novo"* and this Court had, in *Lesniak v FEPC,* 364 Mich 495; 111 NW2d 790 (1961), construed this to mean that the appeal would be heard on the administrative record.[3]

It is assumed, without record support, that the delegate who referred to the FEPA and a majority of the delegates as well had become aware of this Court's decision five months earlier in *Lesniak* and —despite the clear statements on the record of the Constitutional Convention that a *trial de novo* meant "re-presenting the evidence" and trying the case "from the beginning"—had adopted or intended the *Lesniak* construction of the term *"tried de novo."*[4] I would not indulge such an assumption.

---

[2] *Id.,* p 3118.

[3] MCL 423.301 *et seq.;* MSA 17.458(1) *et seq.,* repealed by 1976 PA 453 and replaced by the Civil Rights Act, MCL 37.2101 *et seq.;* MSA 3.548(101) *et seq.*

[4] The opinion of the Court acknowledges that the decision in *Lesniak* "was reached in part to avoid an interpretation which would unconstitutionally delegate factfinding functions of an agency to the courts . . . ." See *Lesniak, supra,* p 505.

II

The argument that a construction of *"tried de novo"* that would permit a new trial would undermine the importance of the CRC begs the question. It was for the delegates to the Constitutional Convention and not the justices of this Court to decide whether there should be a new trial.

In this connection, we note that the Legislature has provided for dual remedies. A complainant need not present his case to the CRC. Even if the complaint is presented to the CRC, the complainant can thereafter file a circuit court action[5] as long as he acts within the three-year statute of limitations allowed therefor.[6]

Since the practice has been that the complainant can file with the CRC, go to a hearing before the CRC, and obtain a new trial hearing on appeal to the circuit court, a complainant could obtain a trial hearing in the circuit court either upon appeal from the CRC or by filing a separate action in the circuit court.[7]

There appears to be a preference on the part of complainants and defendants for a judicial determination of the issues involved in a civil rights case. Complainants will continue to be able to exercise their preference because they can file an

---

[5] MCL 37.2801; MSA 3.548(801). See also *Holmes v Haughton Elevator Co,* 404 Mich 36; 272 NW2d 550 (1978).

[6] MCL 600.5805(8); MSA 27A.5805(8). See *Mair v Consumers Power Co,* 419 Mich 74; 348 NW2d 256 (1984).

[7] One of the consequences of today's decision will be that a complainant who files with the CRC, but does not also file a timely action in the circuit court runs the risk of never having a hearing before either the CRC or the circuit court. There ordinarily will not be a record to review an adverse decision on the issue of probable cause unless there is a Rule 7 hearing (1979 AC, R 37.7) following an adverse determination on probable cause. If a Rule 7 hearing is provided, there would be a record to review, but that apparently did not occur in this case.

action in the circuit court and avoid a determination by the CRC.

Employers and other defendants will be particularly disadvantaged by today's decision because they may not commence a circuit court action, and will not be able to supplement the record made before the commission. In those cases where the complainant chooses to file a complaint before the CRC, obtains a probable cause determination and tries the merits before the CRC, the record made before the CRC will be the only record and cannot be expanded.

The provisions of the Civil Rights Act providing that the CRC record shall be forwarded to the circuit court are not inconsistent with "representation of the evidence from the beginning." The practice in de novo appeals has generally been to hear the complaint on the record made before the CRC, expanded by such additional testimony and further examination of witnesses who have testified as either side desires.

The CRC hearing thus has not been a useless or pointless consumption of time and resources. The CRC appoints a hearing officer who will generally be a lawyer who hears all the evidence. That record is examined by the CRC and a decision is made, and in the event of an appeal the record is forwarded to the circuit court. Although the parties have been at liberty on appeal to add to the record, the record made before the CRC generally relieved the circuit court of rehearing the witnesses except to the extent either side wished to further examine a witness.

III

The opinion of the Court states two different standards for review before the circuit court. The

Court states that "the circuit court shall review the record produced at the CRC anew, drawing its own inferences and conclusions from that record," and in the next sentence states that the "court shall determine whether the CRC's factual findings and legal conclusions are supported by competent, material, and substantial evidence on the whole record, and whether it acted arbitrarily or without authority." The second sentence provides for a limited judicial review, while the first sentence provides for *de novo* review.

Reading the two sentences together it appears that the Court not only eliminates a new trial on appeal to the circuit court, but provides for limited judicial review, not *de novo* review. It appears to call for the minimum review provided in the constitution for review of agency action, namely, whether the decision is supported by competent, material, and substantial evidence on the whole record.[8]

In eliminating a new trial and providing for the limited judicial review that applies to all other agencies, the Court has in effect read *"trial de novo"* out of the constitution.

CAVANAGH, J., concurred with LEVIN, J.

ARCHER, J., took no part in the decision of this case.

_____

[8] Const 1963, art 6, § 28.